**Entered on Docket**
**September 25, 2006**

_____
**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

| | |
|---|---|
| In re: | Case No.: BK-S-06-10231-LBR |
| GERARDO A. TREJOS, JR., and CHRISTINA A. TREJOS, | Chapter 13 |
| Debtors. | Date:    June 20, 2006<br>Time:    1:30 p.m. |

**OPINION CONFIRMING DEBTOR'S PLAN**

**I.    INTRODUCTION**

Gerardo and Christina Trejos bought a used 2002 Volkswagen Passat from Desert Volkswagen on July 5, 2005.[1]  The purchase price was $18,701.40, which included $995 for an extended warranty.  Desert Volkswagen agreed to finance the purchase, after a $1,000 down payment, at 13.35% over 60 months.  The monthly payment was set at $408.16.

Gerardo drove the car off the lot, and sometime thereafter, Desert Volkswagen assigned the Trejos' contract to VW Credit, Inc.  Before filing his bankruptcy case, Gerardo apparently made his monthly payments to VW Credit, although his testimony was that he thought he was paying Desert Volkswagen.  Regardless, when Gerardo and Christine Trejos filed bankruptcy on February 21, 2006, they owed $18,802.38 on the contract, and VW Credit filed a proof of claim

---

[1]Gerardo alone signed the contract because of some problem with Ms. Trejos' credit.  The debtors' joint plan, however, proposes to pay the claim arising from that contract.  Given the claim's probable status as a community debt under Nevada law, the court does not consider the absence of Ms. Trejos' signature on the original contract significant in this case.

1

in that amount.

The Trejos' plan seeks to pay 100% to all creditors. With respect to VW Credit's claim, however, the plan proposes to bifurcate the total claim into a secured claim of $12,525 (the stipulated value of the car) and an unsecured claim of $6,277.38. It then proposes to pay the secured claim over the life of the plan with interest at 8.0%, which is one-half of a percentage point above the applicable prime rate as stipulated by the parties.

VW Credit objects, and claims that provisions in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA)[2] preclude the proposed treatment. VW Credit asserts that its claim may not be bifurcated, and that any payment over time must be at the contract rate of 13.35%.

## II.   CONFIRMATION WITHOUT VW CREDIT'S CONSENT

The debtors seek to confirm the plan without VW Credit's consent. They may do this, but only within the requirements of Section 1325(a)(5)(B). That section provides, in relevant part, that a plan shall be confirmed if:

> (5)   with respect to each allowed secured claim provided for by the plan—
>     . . . .
>     (B)   (i)   the plan provides that—
>         (I)   the holder of such claim retain the lien securing such claim until the earlier of—
>             (aa)   the payment of the underlying debt determined under nonbankruptcy law; or
>             (bb)   discharge under section 1328 . . . [and]
>     (ii)   the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim . . . .

11 U.S.C. § 1325(a)(5).

Here, the debtors propose to leave the lien on the car, thereby complying with Section 1325(a)(5)(B)(i). They then propose to satisfy Section 1325(a)(5)(B)(ii) with monthly payments to VW Credit based on a value of $12,525 and an annual, simple interest rate of 8.0%. That stream

---

[2]Pub. L. 109-8, § 306(b), 119 Stat. 23, 80 (2005).

of payments, the debtors contend, will satisfy Section 1325(a)(5)(B)'s requirement that they provide VW Credit with "property" – that is, the monthly payments – "on account of such claim" – that is, for application to VW Credit's claim that is secured by a security interest in the debtors' car – of a "value, as of the effective date of the plan . . . not less than the allowed amount of such claim." Put another way, debtors contend that their proposed stream of payments will, over the life of their plan, have a present value of $12,525.

## III.    BAPCPA AND THE "HANGING PARAGRAPH"

Had this case been filed before October 17, 2005, debtors' proposed treatment would not have raised any objection. For cases such as debtors' that were filed after that date, however, debtors' proposed treatment raises serious concerns. These concerns stem from the following statutory text, added by Section 306(b) of BAPCPA.[3]

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [*sic*] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

Because of its odd placement in the statute as enacted,[4] this text has no clear home in

---

[3]The history of the hanging paragraph is recounted in detail in William C. Whitford, *A History of the Automobile Lender Provisions of BAPCPA*, 2007 ILL. L. REV. — (forthcoming; available as University of Wisconsin Legal Studies Research Paper No. 1020 (June 2006) at http://ssrn.com/abstract=907086). A shorter description is Richard I. Kilpatrick, *Selected Creditor Issues under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 AM. BANKR. L.J. 817, 834-35 (2005).

[4]The preamble simply states that:

RESTORING THE FOUNDATION FOR SECURED CREDIT.—Section 1325(a) of title 11, United States Code, is amended by adding at the end the following:

The text that follows, which is set forth in the body of this opinion, is not indented, and the usual guides to placement are not present, leaving the reader to wonder whether it should be a new paragraph or a continuation of the last part of paragraph (9) of Section 1325(a). Different services have treated the placement of this statutory language in different ways. *Cf.* MINI•CODE, SPECIAL REDLINED EDITION 209 (April, 2005 ed., AWHFY, L.P., Publishers, 2005) (no new paragraph; continuation of paragraph (9)); COLLIER PORTABLE PAMPHLET, 2005 SUPPLEMENT 423 (LexisNexis Publishers, 2005) (separate new paragraph appearing after conclusion of paragraph (9)).

Section 1325(a), and thus has been referred to as the "hanging paragraph," which is the designation this opinion will use.[5]

Among other things, the hanging paragraph treats certain cars differently by exempting them from Section 506 of the Bankruptcy Code. Before Congress added the hanging paragraph, Section 506(a) allowed debtors to split an otherwise unitary secured claim into two claims – a secured claim equal to the value of the collateral, and an unsecured claim for the balance, if any. In chapter 13, the creditor then received, over time, the full value of the secured claim (that is, the value of the car), and an unsecured claim for the balance. The effect of this is that the undersecured creditor's deficiency claim received the same percentage recovery as all other unsecured claims). This overall treatment mirrored what the creditor would have received had the debtor not filed; absent bankruptcy, the creditor could repossess and foreclose on the car, and then sue the debtor for the deficiency.

*A.*    *The Issues*

Resolution of this case requires parsing the hanging paragraph to answer at least two questions: Does the hanging paragraph remove certain purchase-money claims from the status of allowed secured claims; and second, if it does not, does the purchase-money status of such a claim pass to assignees of the creditor who originally provided the debtor with value?

**1.    Does Section 506 Apply in This Case?**

With respect to the first question, debtors have questioned the effect of the language in the hanging paragraph that states that "section 506 shall not apply to a claim described in that paragraph," presumably a reference to paragraph (5) of Section 1325(a). Just what this effect is turns out to be a thorny question of statutory interpretation, upon which many, many bankruptcy

---

[5]Some courts have taken to referring to this statutory addition as the "starred" paragraph. *See, e.g.,* Triad Fin. Corp. v. Brown (*In re* Brown), 346 B.R. 246, 249 n.1 (Bankr. M.D. Ga. 2006); *In re* Osborn, 2006 WL 2457933, at n. 4 (Bankr. W.D. Mo. 2006). While this usage has merit, it makes it more difficult to electronically search opinions that use this designation because electronic services such as Lexis and Westlaw use the asterisk ("*"), the symbol commonly used to represent the star, as a universal search character.

judges have already given their views.[6]  The number and diversity of these opinions reflects that the hanging paragraph is a poorly drafted provision in peccant legislation.  Making practical sense of this provision, like trying to make sense of much of BAPCPA, requires bankruptcy judges to adopt the approach of the White Queen, and believe in "as many as six impossible things before breakfast."  LEWIS CARROLL, ALICE'S ADVENTURES IN WONDERLAND & THROUGH THE LOOKING GLASS, ch.5, at 157 (Bantam Classic ed. 1981) (1865 & 1871).[7]

---

[6]*See, e.g.,* DaimlerChrysler Fin. Servs. Ams., LLC v. Brown (*In re* Brown), 339 B.R. 818 (Bankr. S.D. Ga. 2006); Rowley v. Wells Fargo Financial Acceptance, 2006 WL 2466648 (Bankr. S.D. Ill. 2006); Triad Fin. Corp. v. Brown (*In re* Brown), 346 B.R. 246 (Bankr. M.D. Ga. 2006); *In re* Brooks, 344 B.R. 417 (Bankr. E.D.N.C. 2006); *In re* Brown, 346 B.R. 868 (Bankr. N.D. Fla. 2006); *In re* Bufford, 343 B.R. 827 (Bankr. N.D. Tex. 2006); *In re* Carver, 338 B.R. 521 (Bankr. S.D. Ga. 2006); *In re* Clay, 339 B.R. 784 (Bankr. D. Utah 2006); *In re* Curtis, 345 B.R. 756 (Bankr. D. Utah 2006); *In re* DeSardi, 340 B.R. 790 (Bankr. S.D. Tex. 2006); *In re* Duke, 345 B.R. 806 (Bankr. W.D. Ky. 2006); *In re* Ezell, 338 B.R. 330 (Bankr. E.D. Tenn. 2006); *In re* Fleming, 339 B.R. 716 (Bankr. E.D. Mo. 2006); *In re* Green, 2006 WL 2531531 (Bankr. M.D. Ga. 2006); *In re* Gress, 344 B.R. 919 (Bankr. W.D. Mo. 2006); *In re* Hill, 328 B.R. 490 (Bankr. S.D. Tex. 2005);  *In re* Horn, 338 B.R. 110 (Bankr. M.D. Ala. 2006); *In re* Jackson, 338 B.R. 923 (Bankr. M.D. Ga. 2006); *In re* Johnson, 337 B.R. 269 (Bankr. M.D.N.C. 2006); *In re* Lewis, 2006 WL 2372162 (Bankr. D. Kan. 2006); *In re* Long, 2006 WL 2090246 (Bankr. E.D. Tenn. 2006); *In re* Lowder, 2006 WL 1794737 (Bankr. D. Kan. 2006); *In re* McElroy, 339 B.R. 185 (Bankr. C.D. Ill. 2006); *In re* Mehl, 2005 WL 2806676, 55 Collier Bankr. Cas.2d 216 (Bankr. C.D. Ill. 2005); *In re* Montgomery, 341 B.R. 843 (Bankr. E.D. Ky. 2006); *In re* Montoya, 341 B.R. 41 (Bankr. D. Utah 2006); *In re* Murray, 346 B.R. 237 (Bankr. M.D. Ga. 2006), *on reh'g, In re* Murray, 2006 WL 2457851 (Bankr. M.D. Ga. 2006); *In re* Osborn, 2006 WL 2457933 (Bankr. W.D. Mo. 2006); *In re* Parish, 2006 WL 1679710 (Bankr. M.D. Fla. 2006); *In re* Payne,  2006 WL 2289371 (Bankr. S.D. Ohio 2006); *In re* Pryor, 341 B.R. 648 (Bankr. C.D. Ill. 2006); *In re* Quevedo, 345 B.R. 238 (Bankr. S.D. Cal. 2006); *In re* Robinson, 338 B.R. 70 (Bankr. W.D. Mo. 2006); *In re* Scruggs, 342 B.R. 571 (Bankr. E.D. Ark. 2006); *In re* Shaw, 341 B.R. 543 (Bankr. M.D.N.C. 2006); *In re* Soards, 344 B.R. 829 (Bankr. W.D. Ky. 2006); *In re* Sparks, 346 B.R. 767 (Bankr. S.D. Ohio 2006); *In re* Taranto, 344 B.R. 857 (Bankr. N.D. Ohio 2006); *In re* Tomasini, 339 B.R. 773 (Bankr. D. Utah 2006); *In re* Turner, 2006 WL 2529570 (Bankr. D.S.C. 2006); *In re* Vega, 344 B.R. 616 (Bankr. D. Kan. 2006); *In re* Wampler, 345 B.R. 730 (Bankr. D. Kan. 2006); *In re* Wright, 338 B.R. 917 (Bankr. M.D. Ala. 2006).

[7]The exchange leading up to the quotation is as follows:

Alice laughed. 'There's no use trying,' she said: 'one *can't* believe impossible things.'

'I daresay you haven't had much practice,' said the Queen. 'When I was your age, I always did it for half-an-hour a day. Why, sometimes I've believed as many as six impossible things before breakfast.'

I am indebted to Judge William Hillman for this reference, but other bankruptcy judges have weighed in on the quality of BAPCPA's drafting.  *E.g., In re* Donald, 343 B.R. 524 (Bankr. E.D.N.C. 2006) ("[t]he BAPCPA amendments . . . are confusing, overlapping and sometimes self-contradictory.  They introduce new and undefined terms that resemble, but are different from, established terms that are well understood.  Furthermore, the new provisions address some situations that are unlikely to arise.  Deciphering this puzzle is like trying to solve a Rubik's Cube that arrived with a manufacturer's defect.") (Small, J.); *In re* Paschal, 337 B.R. 274, 276 (Bankr. E.D.N.C. 2006)

1        **2.        The Process of Statutory Interpretation**

2        The basics of how to interpret statutory text such as the hanging paragraph are not unduly

3   complicated, but (as always) the devil is in the details.  Unlike the statute examined in *In re* Kane,

4   336 B.R. 477 (Bankr. D. Nev. 2006), the language of the hanging paragraph has no obvious errors

5   of reference or sense, making inapplicable both the absurdity doctrine and those cases regarding

6   scriveners' errors.  *Id.*, at 485-87.  Moreover, its history and its purpose are both far from clear, *see*

7   Whitford, *supra*, at 43-45, making any construction that requires exact determination of that

8   purpose somewhat problematical.  Add to this mix the stark reality that the implications of a

9   straightforward reading of the hanging paragraph are significant: For certain purchase-money

10  loans, it would preclude application of an elemental and bedrock principle of bankruptcy law –

11  Section 506's treatment of secured claims – in the narrow but historically important area of car

12  loans in chapter 13.

13        a.        Plain Meaning

14        Do the words of the hanging paragraph effect this type of change?  When faced with the

15  task of construing a statute, the presumption is that the accepted and plain meaning of the words

16  is what Congress intended.  As the Supreme Court has said:

17        The starting point in discerning congressional intent . . . is the existing statutory
         text . . . and not the predecessor statutes.   It is well established that "when the
18        statute's language is plain, the sole function of the courts — at least where the
         disposition required by the text is not absurd — is to enforce it according to its
19        terms."

20  Lamie v. United States Trustee, 540 U.S. 526, 534 (2004), *quoting* Hartford Underwriters Ins. Co.

21  v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000) (internal quotation marks omitted), *in turn*

22  *quoting* United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241(1989), *in turn quoting* Caminetti

23  v. United States, 242 U.S. 470, 485 (1917).  *See also* San Jose Christian Coll. v. City of Morgan Hill,

24  _____

25  (stating that "in an Act in which head-scratching opportunities abound for both attorneys and judges alike, §
    362(c)(3)(A) stands out.") (Small, J.); *In re* Charles, 332 B.R. 538, 541 (Bankr. S.D. Tex. 2005) (the provisions of §
26  362(c)(3) "are, at best, particularly difficult to parse and, at worst, virtually incoherent.") (Isgur, J.).

360 F.3d 1024, 1034 (9th Cir. 2004) ("Where a statute fails to define a key term, this court's 'duty, in matters of statutory construction, is to give effect to the intent of Congress.'"), *quoting* A-Z Int'l v. Phillips, 323 F.3d 1141, 1146 (9th Cir. 2003).

<u>b.</u>    <u>Textualism and Context</u>

In determining the appropriate sense, investigation into ways in which the Bankruptcy Code uses the same or similar words is appropriate, especially when that usage comports with common usage.  Rousey v. Jacoway, 544 U.S. 320, 326-27 (2005) (looking at use of "on account of" in provisions of the Bankruptcy Code other than the one at issue).  This contextual approach to interpreting federal statutes was recently summarized by a leading academic textualist, Professor John F. Manning of Harvard Law School:

> In contrast with their ancestors in the "plain meaning" school of the late nineteenth and early twentieth centuries, modern textualists do not believe that it is possible to infer meaning from "within the four corners" of a statute.  Rather, they assert that language is intelligible only by virtue of a community's shared conventions for understanding words in context.  While rejecting the idea of subjective legislative intent, they contend that the effective communication of legislative commands is in fact possible because one can attribute to legislators the minimum intention "to say what one would be normally understood as saying, given the circumstances in which one said it."  Textualists thus look for what they call "'objectified' intent – the intent that a reasonable person would gather from the text of the law, placed alongside the remainder of the corpus juris."

John F. Manning, *What Divides Textualists From Purposivists?*, 106 COLUM. L. REV. 70, 79-80 (2006) (footnotes omitted).[8]

A textualist approach does not mean that statutory text must be read as if the intended reader were an unlettered schoolchild.  Rather, as Professor Manning notes, a textualist approach seeks the semantic meaning of the words, *id.* at 91-93, a fancy designation for how to determine the meaning of a collection of words written together, such as a statute.  Determining a statute's semantic meaning requires a judge to examine the context in which that statutory text is placed.

---

[8]This approach has been used by Justice Scalia, one of the leading textualists on the Supreme Court.  *See* Deal v. United States, 508 U.S. 129, 132 (1993) (Scalia, J.) (arguing that it is a "fundamental principle of statutory interpretation (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").

*Cf.* Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); ("'To this end, "it is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms."'" *San Jose Christian Coll.*, 360 F.3d at 1034, *quoting* Kaplan v. City of N. Las Vegas, 323 F.3d 1226, 1231-32 (9th Cir. 2003).

That context may include dictionaries, etymologies, and guides to grammar and common usage such as the various canons of statutory construction. *E.g.,* Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 460 (1999) (using dictionaries to determine meaning of "on account of"); Muscarello v. United States, 524 U.S. 125, 129 (1998) (using etymology of "carries" to construe reach of statute that prohibited carrying firearms); Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253(1992) ("canons of construction are no more than rules of thumb that help courts determine the meaning of legislation."); Landgraf v. USI Film Prods., 511 U.S. 244, 263-64 & n.16 (1994) (observing that canons may often lead to different results, citing Karl Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons about How Statutes Are to Be Construed*, 3 VAND. L. REV. 395 (1950));[9] *San Jose Christian Coll.*, 360 F.3d at 1034 ("'To determine the 'plain meaning' of a term undefined by a statute, resort to a dictionary is

---

[9]The Ninth Circuit Court of Appeals noted recently that it has "long held that however helpful rules of construction may be, the courts will 'construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy.'" Clark v. Capital Credit & Collection Serv., Inc., 2006 WL 2441705 (9th Cir., Aug. 24, 2006), *quoting* Matheson v. Armbrust, 284 F.2d 670, 674 (9th Cir.1960), *in turn quoting* S.E.C. v. C.M. Joiner Leasing Corp., 320 U.S. 344, 350-51 (1943). *See also* John F. Manning, *Legal Realism & The Canons' Revival*, 5 GREEN BAG 283 (2002).

permissible.'"). *See also* George Costello, *Statutory Interpretation: General Principles and Recent Trend*s, CONGRESSIONAL RESEARCH SERVICE, at CRS-3 ("the meaning of a specific statutory directive may be shaped, for example, by that statute's definitions of terms, by the statute's statement of findings and purposes, by the directive's relationship to other specific directives, by purposes inferred from those directives or from the statute as a whole, and by the statute's overall structure. Courts also look to the broader context of the body of law into which the enactment fits"), *available at* http://www.fas.org/sgp/crs/misc/97-589.pdf.  These are all general aids to construction of sentences and other utterances humans make.

But there is more.  Because the words of a statute are meant to be law, the legal background, as well as a lawyer's understanding, of the words used are also important.  "Utter," for example, has a completely different meaning in the world of commercial paper than it does in literary parlance.  *See* NEV. REV. STAT. § 205.110 ("Every person who, knowing the same to be forged or altered, and with intent to defraud, shall utter . . . any forged writing . . . shall be guilty of forgery the same as if he had forged the same.").  Moreover, statutory law makes liberal use of codes, or collections of related statutes.  Title 11, which contains the Bankruptcy Code, is one such code, and it contains many of the attributes that are common to all codes.  The definitions of terms used throughout a code, for example, may vary from what one untutored in law would expect: in the Bankruptcy Code, a "custodian" is not a janitor or building superintendent, *see* 11 U.S.C. § 101(11); and in the Uniform Commercial Code, "afternoon," can mean one minute before midnight.  *See* UNIF. COMM. CODE § 4-104(a)(2) ("afternoon" is any time between noon and midnight).[10]  Further, the Supreme Court has acknowledged that within a code such as the

---

[10]Although not the case with the Bankruptcy Code, some codes, such as the Uniform Commercial Code, arrive at the legislature with specific commentary drafted by the organization that prepared the statute for the legislature's consideration.  The court ventures a guess that any rule that would require commercial lawyers to ignore the official comments to the Uniform Commercial Code would be viewed, at a minimum, as heresy.  This is not to say, however, that the comments should control when in conflict with the statutory text; to the contrary, courts overwhelmingly favor a straightforward reading of statutory text over comments.  *See, e.g.*, Pride Hyundai, Inc. v. Chrysler Fin. Co., L.L.C., 369 F.3d 603, 613-14 (1st Cir. 2004).

Bankruptcy Code, similar words and phrases presumptively will receive the same construction, even if found in different parts of the code.  *See* Rousey v. Jacoway, 544 U.S. 320, 326-27 (2005) (looking at use of "on account of" in provisions of the Bankruptcy Code other than the one at issue).[11]

There are, as can be seen, many sources of clues about what a statutory text means, and in appropriate cases, all of these sources are capable of providing assistance about the meaning of a statute.  Textualists have no problem with this in appropriate cases; as Professor Manning states it, "Textualists further acknowledge that '[i]n textual interpretation, context is everything.'" John F. Manning, *What Divides Textualists From Purposivists?*, 106 COLUM. L. REV. 70, 80 (2006) (footnotes omitted), *quoting* Antonin Scalia, *Common-Law Courts in a Civil Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, in A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 37 (1997).  Put simply, "modern textualists urge judges to focus on what they consider the more realistic – and objective – measure of how 'a skilled, objectively-reasonable user of words' would have understood the statutory text in context." John F. Manning, *supra*, 106 COLUM. L. REV. at 75, *quoting* Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 HARV. J.L. & PUB. POL'Y 59, 65 (1988).[12]

What a textualist approach does not condone, however, is the imputation of a congressional purpose based on materials that cannot or do not reflect a unitary congressional purpose,[13]

---

[11]The practice of bankruptcy is also full of specialized argot.  See Richard I. Aaron, *Hooray for Gibberish!  A Glossary of Bankruptcy Slang for the Occasional Practitioner or Bewildered Judge*, 3 DEPAUL BUS. & COMM. L.J. 141 (2005).

[12]Indeed, one recent article has stated that the difference between textualism as discussed above and other views is more "a difference in emphasis rather than a sharp disagreement over methodology."  Jonathan T. Molot, *The Rise and Fall of Textualism*, 106 COLUM. L. REV. 1, 4 (2006).  *But cf.* Manning, *supra,* 106 COLUM. L. REV. at 79 ("significant practical and theoretical differences continue to separate textualism from purposivism.").

[13]This assumes, of course, that it makes semantic sense to impute a single intent to a multimember body such as Congress.  Modern textualists tend to deny this imputation.  *See, e.g.*, Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 68 (1994) ("Intent is elusive for a natural person, fictive for a collective body."); Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 DUKE L.J. 511, 517; ("[T]he quest for the 'genuine' legislative intent is probably a wild-goose chase anyway.").  As Professor Manning points out, this skepticism traces back at least to the legal realist Max Radin. John F. Manning, *What Divides*

followed by the use of that purpose to definitively construe straightforward text.  This is an area without crisp boundaries.  Textualists will look at background and legislative history when a fair reading of the statute does not answer the particular question at hand or, in plain English, when the statute is ambiguous.

But ambiguity tends to be in the eye of the interpreter.  We know, for example, that grammatical errors do not necessarily create ambiguity.  Lamie v. United States Trustee, 540 U.S. 526, 534 (2004) ("One determines ambiguity, under this contention, by relying on the grammatical soundness of the prior statute.  That contention is wrong.").  We also probably know that a good-faith dispute among litigants over what a statute means is not the same as ambiguity.  Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 461 (1999) (Thomas, J., dissenting) ("A mere disagreement among litigants over the meaning of a statute does not prove ambiguity; it usually means that one of the litigants is simply wrong.")

The last word has yet to be written on when, and how, external sources such as legislative history, earlier statutory enactments, and even background judicial opinions can be used or are useful in statutory construction.  As a result, when first presented with a tough question of statutory interpretation, almost every lawyer or judge will latch on to anything that might illuminate the meaning of the words Congress chose, much like a drowning man will grasp for anything floating that might work as a life preserver.  This is not per se harmful; simply consulting potentially irrelevant materials doesn't disqualify a judge – or anyone else for that matter – from being able ultimately to properly construe the statute.

But even after all such consultations, the statutory language may stubbornly refuse to yield a canonical meaning.  Academics might be able to defer or hedge the question at this point, but judges have an obligation to apply the statute before them.  There is a duty to make sense of the statute to the extent that is possible, and to give it an interpretation consistent at least with its

_Textualists From Purposivists?_, 106 COLUM. L. REV. 70, 73-74 & n.12 (2006).

semantic sense, if not consistent with some well-articulated purpose.

B.    *The "Hanging Paragraph" and Section 506 – What is an "Allowed Secured Claim"?*

That brings us to the hanging paragraph, and its proper interpretation.

Understanding the effect of the hanging paragraph begins with Section 1325(a) and expands to its context within the Bankruptcy Code.  Section 1325(a) requires confirmation – it says that a court "shall" confirm a plan – if the debtor demonstrates satisfaction of all nine paragraphs, one of which is paragraph (5).  The beginning of that paragraph (some in legislative drafting circles would call it the "chapeau" or the "umbrella") states its scope: "with respect to each allowed secured claim provided for by the plan—".  The paragraph is then divided into two subparagraphs: subparagraph (A), which deals with those cases in which the holder of the allowed secured claim consents to the treatment contained in the plan; and subparagraph (B), which deals with those cases in which the holder does not consent.

The interpretive difficulty comes when trying to read Section 1325(a)(5)(B) consistently with the hanging paragraph.  The hanging paragraph states that "for purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph . . ." if various conditions, claimed by VW Credit to be present in this case, are satisfied.  Any attempt to reconcile the hanging paragraph with Section 1325(a)(5) raises a host of questions.  Initially, the hanging paragraph refers to "a claim described in that paragraph," where "that paragraph" presumably refers to paragraph (5).  But paragraph (5) contains no description or definition of a claim, secured or unsecured; rather, it contains a reference to "each allowed secured claim provided for by the plan."  Initially, then, it would seem that the hanging paragraph anticipates that there will be an allowed secured claim as provided for in the plan, and that the hanging paragraph will operate on that claim.

The problem with this interpretation, however, is that if Section 506 does not apply, it is unclear how VW Credit's claim can ever be categorized as a secured claim; indeed, in this case the debtors have seized on this argument to contend that VW Credit is the holder of an unsecured

claim.  Section 506(a) states that "[a]n allowed claim of a creditor secured by a lien on property . . . is a secured claim . . . ."  It is the only applicable section that uses or describes the term "secured claim."[14]  If the effect of the hanging paragraph is that Section 506(a) does not apply to nonconsensual treatment of certain secured creditors in chapter 13, is the effect of the hanging paragraph to deprive the "allowed secured claim" of "secured" status?  *Cf. San Jose Christian Coll.*, 360 F.3d at 1034 ("'When a statute does not define a term, a court should construe that term in accordance with its "ordinary, contemporary, common meaning."'"), *quoting A-Z Int'l*, 323 F.3d at 1146 (citation omitted).

The answer to these questions turns on whether Section 506 contains the exclusive definition of a secured claim.  If it does, then arguably there is no secured claim, and paragraph (5) becomes irrelevant since it applies only to "allowed secured claim[s] provided for by the plan."  COLLIER takes this position, and indicates that if Section 506 does not apply, then there cannot be a secured claim at all, essentially arguing that a claim may not be a "secured claim" for purposes of Section 1325(a)(5) if it is not somehow run through Section 506:

> This new language states that for purposes of section 1325(a)(5), section 506 shall not apply to certain claims.  Such claims, therefore, *cannot be determined to be allowed secured claims under section 506(a) and are not within the ambit of section 1325(a)(5)*. . . .
>
>     It is possible that [the hanging paragraph] was intended to prohibit the use of section 506(a) to bifurcate a secured claim into an allowed secured claim and an allowed unsecured claim as part of the cramdown permitted by section 1325(a)(5)(B) and, therefore, that such claims should be treated as fully secured claims regardless of the value of the collateral.  But, even if that was the intent, because *the new language added to section 1325(a) renders entirely inapplicable for some creditors the only section, section 506(a), that gives those creditors allowed secured claims*, it does not to [*sic*] carry out such intent.

8 COLLIER ON BANKRUPTCY ¶ 1325.06[1][a], at pp. 1325-28 to 1325-29 (Henry Sommer & Alan Resnick, eds., 15th rev. ed. 2006) (emphasis supplied).[15]  Several courts have followed or adopted

---

[14]Section 1111(b)(2) also states when a claim secured by a lien on estate property is a "secured claim," but that section applies only in chapter 11.  *See* 11 U.S.C. § 103(g).

[15]Collier buttresses its view by the legislative history of the provision, noting that "[i]n fact, earlier versions of the 2005 bankruptcy legislation had contained language which eliminated only the section 506(a) bifurcation of

a form of this logic. *See In re* Carver, 338 B.R. 521 (Bankr. S.D. Ga. 2006); *In re* Green, 2006 WL 2531531 (Bankr. M.D. Ga. 2006); *In re* Taranto, 344 B.R. 857 (Bankr. N.D. Ohio 2006); In *re* Wampler, 345 B.R. 730 (Bankr. D. Kan. 2006).[16]

The reading urged by COLLIER and these cases would thus relegate claims in chapter 13 secured by liens to the status of unsecured claims. In providing for such claims in the plan, according to COLLIER, "[a] debtor is presumably bound only by the dictates of good faith and the other provisions of the Code in determining how such claims may be modified." *Id.*

It is undisputed that the hanging paragraph is poorly drafted.[17] But the fact that an expert, trained in both drafting and bankruptcy, would have written the statute differently is not sufficient reason to exclude an interpretation that would have resulted from that better drafting. Rough roads can lead to the same destination as superhighways, and the Supreme Court has told us that

---

certain claims into secured and unsecured claims based on the value of the property, but did not eliminate their status as allowed secured claims. However, that language was not retained." 8 COLLIER ON BANKRUPTCY ¶ 1325.06[1][a] (Henry Sommer & Alan Resnick, eds., 15th rev. ed. 2006).

The legislation to which Collier refers, however, was functionally similar to the hanging paragraph. The operative provision of each uses the same locution – "shall not apply." In particular, the legislation to which COLLIER refers specifically provided that "subsection (a) [of Section 506] *shall not apply* to an allowed claim to the extent attributable in whole or in part to the purchase price of personal property . . . ." H.R. 833, 106th CONG., 1ST SESS. § 122, at 55 (April 29, 1999) (proposed addition of Section 506(e)(1); emphasis supplied). Both the hanging paragraph and Section 122 function by excluding that part of Section 506 which COLLIER assumes is the exclusive source of secured claim status. But Section 122, after excluding Section 506(a), then purported to set "the amount of the allowed secured claim" without reference to any other section of the Bankruptcy Code. H.R. 833, 106th CONG., 1ST SESS. § 122, at 55 (April 29, 1999) (proposed addition of Section 506(e)(2)). This reading – that Section 506(a) merely divides and defines an allowed secured claim rather than creating it – is also supported by the House Report on H.R. 833. *See* H. REP. NO. 106-123, at 128 (1999). Both the proposed statute and the House Report suggest that the drafters of H.R. 833 did not think that Section 506 was essential to having an allowed secured claim. For a detailed history of the competing House and Senate versions of these provisions, and the alternate placing of it in Section 1325(a) and Section 506, *see* Whitford, *supra* note 3, at 33-41.

[16]These courts, however, are in the decided minority, as a scan of the cases set forth in note 6 above indicates.

[17]The hanging paragraph has within it an obvious syntactical error – the phrase "within the 910-day preceding the date of filing" was probably meant to say "within the 910-day *period* preceding the date of filing," or "within 910 day*s* preceding the date of filing," although nothing in this case turns on this infelicity. The difficult interpretive questions arise when trying to fit the hanging paragraph into the context of the preexisting provisions of chapter 13.

awkward, or even ungrammatical, drafting does not make a statute meaningless.  *See Lamie*, 540 U.S. at 534.  But less-than-perfect drafting does make it more difficult to determine what a statute is supposed to mean; if a plain reading of the statute does not produce a settled meaning, then further examination of the context of the statute is required.

Looking at the hanging paragraph as a textualist would, there are significant structural and precedential reasons as to why a proper reading of that paragraph does not deprive claims covered by it of their status as secured claims under chapter 13.  The primary argument against such status is that Section 506 now does not apply, and thus secured status cannot trace back to that statute.  But that position assumes Section 506 is the sole source of a claim's secured status.  It is not.

The first thing to note about Section 506 is that it is not located in Chapter 1 of the Code, which contains all general definitions the Code uses.  Rather, Section 506 simply provides one category of secured claims (another is found in 11 U.S.C. § 1111(b)(2))[18] – and the one it provides is intentionally both underinclusive and overinclusive of what nonbankruptcy law considers as secured.  It is underinclusive in that it does not count as a secured claim a claim that is secured by nonstate property, although the secured party would hardly discount that security.  *See* IRS v. Snyder, 343 F.3d 1171 (9th Cir. 2003).  It is overinclusive in that it counts as a secured claim an unsecured claim to the extent that the holder of that claim holds a claim that may be set off against the claim owed the estate.  *See* UNIF. COMM. CODE § 9-109(d)(10)(excluding "a right of recoupment or setoff" from the scope of Article 9).[19]

_____

[18]As indicated above, in chapter 11, Section 1111(b)(2) provides for an alternate definition of secured claim in certain situations.  True, Section 1111(b)(2) contains an indication that it applies "notwithstanding Section 506(a)," but Section 1129(b)(2)(A), for example, applies regardless of whether Section 506(a) or Section 1111(b)(2) provides the relevant categorization of a secured claim.  This indicates that a cramdown provision may look outside itself at more than one description of a secured claim.

[19]Grant Gilmore, the principal drafter of the original Article 9, went so far as to state that the express exclusion of setoff from Article 9 was ludicrous, because it was obvious that it could not be a security interest:

This exclusion [of setoff rights] is an apt example of the absurdities which result when draftsmen attempt to appease critics by putting into a statute something that is not in any sense wicked but is hopelessly irrelevant.  Of course a right of set-off is not a security interest and has never been

15

Construing Section 506 to be the exclusive source of a claim's status as an allowed secured claim would also be at odds with how the Supreme Court has read that term. In Dewsnup v. Timm, 502 U.S. 410 (1992), the Court was faced with whether the provisions of Section 506(a) controlled the use of the term "allowed secured claim" when it appeared in Section 506(d) in a chapter 7 case. In holding that it did not, the Court adopted the view:

> that the words "allowed secured claim" in § 506(d) need not be read as an indivisible term of art defined by reference to § 506(a), which by its terms is not a definitional provision. Rather, the words should be read term-by-term to refer to any claim that is, first, allowed, and, second, secured.

*Id.* at 415.[20] Although the specific holding of *Dewsnup* is not relevant here, its approach to statutory interpretation is, especially its discussion of how "allowed secured claim" is to be construed.

In addition, the basic policies of chapter 13, rehabilitation of individual debtors and equitable treatment of creditors, are still a valid background and contextual consideration, especially when interpreting a code as opposed to a single statute. If a claim covered by the hanging paragraph is not a secured claim covered by Section 1325(a)(5)(B), then there would be no assurance that the claim secured by the lien would or could be satisfied through the debtors' plan. Because liens survive a debtor's discharge, Long v. Bullard, 117 U.S. 617, 620-21 (1886); Dewsnup v. Timm, 502 U.S. 410, 418 (1992); County of Ventura v. Brawders (*In re* Brawders), 325 B.R. 405, 411 (B.A.P. 9th Cir. 2005), an interpretation that eliminates the ability to treat and satisfy secured claims could lead to foreclosure proceedings with respect to the collateral immediately following the issuance of the discharge at the completion of plan payments. This result would be at odds with the general rehabilitative goals of chapter 13.

---

confused with one: the statute might as appropriately exclude fan dancing.

1 Grant Gilmore, Security Interests in Personal Property, § 10.7, at 315-16 (1965).

[20]The quotation is from the Court's statement of the alternate position of the respondent in the case, joined by the United States as amicus curiae. The Court later stated that: "We conclude that respondents' alternative position, espoused also by the United States, although not without its difficulty, generally is the better of the several approaches." *Dewsnup*, 502 U.S. at 417.

The Bankruptcy Code, broadly read, also acknowledges that a creditor covered by the hanging paragraph holds a lien on estate property or property of the debtor.  The Bankruptcy Code states that "[t]he term 'lien' means charge against or interest in property to secure payment of a debt or performance of an obligation."  11 U.S.C. § 101(37).[21]  The definition itself incorporates the term "secure" to indicate the relationship between the property standing as collateral and the obligation owed.  It is not inaccurate to say that all property encumbered by a lien is secured by that lien, and all that claims receiving the benefit of that lien are claims secured by that lien or, to be compact, secured claims.

From this contextual and precedential analysis, it can be seen that doubt exists as to whether Section 506(a) provides the exclusive definition of allowed secured claims in chapter 13. This doubt ripens into certainty when laid next to the undeniable fact that, as with absolute priority,[22] there is also a  constitutional dimension to secured claims.  Under the fifth amendment, no law can effect the taking of property without just compensation, and the Court has strongly indicated that the Bankruptcy Code is to be construed so as to preserve existing rights of secured creditors.  United States v. Security Indus. Bank, 459 U.S. 70, 81 (1982) ("No bankruptcy law shall be construed to eliminate property rights which existed before the law was enacted in the absence of an explicit command from Congress.").

Even if COLLIER, *Carver*, *Green*, *Taranto*, and *Wampler* were correct about the deprivation of secured status to claims subject to the hanging paragraph, a debtor would still have to adequately protect the secured party's interest in the collateral, as no one doubts that the hanging paragraph does not reach Section 361 and 362 provisions on adequate protection.[23]  Chapter 13 thus can be

---

[21]The Bankruptcy Code defines "judicial lien" and "security interest" with reference to the definition of "lien," 11 U.S.C. §§ 101(36); (51).

[22]*See* John D. Ayer, *Rethinking Absolute Priority After* Ahlers, 87 MICH. L. REV. 963 (1989).

[23]Both *Carver* and *Green* were written by Judge James D. Walker, Jr., a well-respected jurist.  As he stated in *Green*, "I decline to adopt the conclusion that a 910 claim is a secured claim and continue to hold that § 506 is the one and only path to the establishment of a secured claim for bankruptcy purposes." *Green*, 2006 W. 2531531, at

seen to continue to recognize secured claims. Indeed, BAPCPA added a new clause to Section 1325(a)(5)(B) requiring that any periodic payments made under paragraph (5) be sufficient to provide adequate protection to creditors who have an "allowed secured claim provided for by the plan." 11 U.S.C. § 1325(a)(5)(B)(iii).

Against this background, it is evident that Section 506 cannot be read as the exclusive repository of secured status in chapter 13; as noted in *Dewsnup*, Section 506(a) is "not a definitional provision." *Dewsnup*, 502 U.S. at 415; *Brooks*, 344 B.R. at 420-21. *See also* David Gray Carlson, *Cars in Chapter 13 After the 2005 Amendments to the Bankruptcy Code*, available as the Benjamin N. Cardozo School of Law, Jacob Burns Institute for Advanced Legal Studies, Working Paper No. 161, at SSRN: http://ssrn.com/abstract=925567 (8/15/06) ("*Dewsnup* permits unmooring the definition of 'allowed secured claim' from §506(a)(1)."). This result conforms to the structure and workings of chapter 13 and of the Bankruptcy Code itself. If the contractual part of a claim is modified and then satisfied, as compliance with Section 1325(a)(5)(B) assures, then the lien is extinguished; in short, no debt, no lien.[24] Debtors should desire this result, since the goal of a chapter 13 plan is to deal with their debts permanently, and not just during the pendency of the case. And reading the hanging paragraph to simply take away the bifurcation that is unique to bankruptcy, and leave creditors with liens on estate property to still be "secured claims," simply affects the amount that is to be paid to secured creditors.[25]

The consequence of this analysis is that there may be allowed "secured claims" in chapter 13 without resort to Section 506. As a result, in cases in which the hanging paragraph applies, and

---

p. 11. As indicated in text, and despite Judge Walker's analysis, this court comes to a different conclusion regarding the role of Section 506 in the Bankruptcy Code.

[24]The court recognizes that other courts have split on whether a secured creditor can be forced to release its lien of record, after payment in full of the modified allowed secured claim but before completion of all plan payments and the issuance of a discharge. *See, e.g., In re* Day, 292 B.R. 133, 134-35 (Bankr. N.D. Tex. 2003).

[25]The hanging paragraph does not alter Section 1322(b)(2) which allows debtors to modify the claim secured by estate property – debtors may still stretch out maturity dates, alter payment schedules and propose modified interest rates.

the creditor holds an allowed claim secured by a lien, the claim qualifies as an "allowed secured claim provided for by the plan" as anticipated by Section 1325(a)(5).  In this case, VW Credit argues that the hanging paragraph covers its claim and requires the debtors to provide for the full amount of that claim, $18,802.38, over the life of the plan, with interest at its contract rate of 13.35%.

**IV.    IS VW CREDIT'S SECURITY INTEREST A "PURCHASE-MONEY" SECURITY INTEREST WITHIN THE MEANING OF THE HANGING PARAGRAPH?**

This discussion, however, assumes that VW Credit's claim qualifies for the special treatment specified in the hanging paragraph.  Debtors contest this point.  The statute requires that certain conditions exist before the full amount of the claim must be treated as secured.  These conditions are as follows:

- The creditor must have a purchase-money security interest; and
- The purchase-money security interest must secure the debt that is the subject of the claim; and
- That debt must be incurred no more than 910 days before the date of the debtor's filing; and
- The collateral for the debt must be a "motor vehicle"[26]; and
- That motor vehicle must have been acquired for the personal use of the debtor.[27]

---

[26]For purposes of the hanging paragraph, it must be a motor vehicle as defined in 49 U.S.C. § 30102.  That section defines "motor vehicle" as follows:

"motor vehicle" means a vehicle driven or drawn by mechanical power and manufactured primarily for use on public streets, roads, and highways, but does not include a vehicle operated only on a rail line.

49 U.S.C. § 30102(a)(6).

[27]The hanging paragraph also applies "if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing."  11 U.S.C. § 1325(a).  This clause has its own ambiguities – does it require a purchase-money security interest? – but those issues are not before the court at present.

Debtors concede all of these requirements except the first: they contend that the creditor – VW Credit, Inc. – does not hold a purchase-money security interest. The essence of their argument is that the only holder of a purchase-money security interest was Desert Volkswagen, and that when Desert transferred the debt to VW Credit, that transfer destroyed the status of that security interest as a purchase-money security interest.[28]

The concept of a "purchase-money security interest" is not defined in the Bankruptcy Code.[29] In those instances in which it has been used, however, courts have looked to state law generally, and the Uniform Commercial Code (UCC) in particular, for definitions. *See, e.g.*, Pristas v. Landaus of Plymouth, Inc. (*In re* Pristas), 742 F.2d 797, 800 (3d Cir. 1984) (for purposes of Section 522(f)); *In re* Donald, 343 B.R. 524, 536-37 (Bankr. E.D.N.C. 2006); (for purposes of Section 522(f) and hanging paragraph; dicta); *In re* Pan Am Corp., 125 B.R. 372, 376 (S.D.N.Y.), *aff'd*, 929 F.2d 109 (2d Cir.), *cert. denied*, 500 U.S. 946 (1991) (for purposes of former 11 U.S.C. § 1110); Gillie v. First State Bank (*In re* Gillie), 96 B.R. 689, 690-91 (Bankr. N.D. Tex. 1989) (Section 522(f)); H. REP. NO. 595, 95TH CONG., 1ST SESS. 240 (1977) (with respect to 11 U.S.C. § 1110). *But cf.* Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co., 126 S. Ct. 2105, 2113 (2006) ("We follow the lead of an earlier decision . . . in noting that 'here and there in the Bankruptcy Code Congress has included specific directions that establish the significance for bankruptcy law of a term used elsewhere in the federal statutes,'" and then not following the use of the term in a

---

[28]There is no allegation that the addition to the obligation secured by the car of something other than the car's price – the cost of the service agreement – destroyed the purchase-money character of the security interest granted in the car itself. The Uniform Commercial Code explicitly declines to answer this question for consumer-goods transactions. *See* UNIF. COMM. CODE § 9-103(f) (stating that "a purchase-money security interest does not lose its status as such, even if: [¶] (1) the purchase-money collateral also secures an obligation that is not a purchase-money obligation . . ."); § 9-103(h) (stating that § 9-103(f) does not apply in consumer-goods transactions, and that the drafters "intended to leave to the court the determination of the proper rules in consumer-goods transactions."). *See In re* Murray, 346 B.R. 237 (Bankr. M.D. Ga. 2006), *on reh'g, In re* Murray, 2006 WL 2457851 (Bankr. M.D. Ga., August 22, 2006) (finding that inclusion of cost of service agreement does not destroy purchase-money status). *See also In re* Vega, 344 B.R. 616 (Bankr. D. Kan. 2006).

[29]It is, however, used in several places. *E.g*, 11 U.S.C. §§ 522(f)(1)(B); 522(f)(3)(B); 524(k)(3)(G); 1110 (d)(2); 1168(d)(2).

1    separate federal statute due to a lack of direction from Congress that the two provisions should

2    be construed consistently), *quoting* United States v. Reorganized CF & I Fabricators of Utah, Inc.,

3    518 U.S. 213, 219-220 (1996).

4         Section 9-103(b) of the UCC, codified in Nevada at NEV. REV. STAT. § 104.9103.2, states

5    that a "security interest in goods is a purchase-money security interest . . . to the extent that the

6    goods are purchase-money collateral with respect to that security interest."   "Purchase-money

7    collateral," in turn, "means goods or software that secures a purchase-money obligation incurred

8    with respect to that collateral," *id.* § 104.9103.1(a), and "purchase-money obligation means an

9    obligation of an obligor incurred as all or part of the price of the collateral or for value given to

10   enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."

11   *Id.* § 104.9103.1(b).

12        In short, the UCC recognizes two types of purchase-money security interest: the security

13   interest that arises when a seller of goods takes back a security interest to secure the deferred part

14   of the goods' purchase price (or when the seller reserves title in the goods sold until he or she is

15   paid); and the security interest that arises when a lender or other financier extends credit to the

16   debtor to enable the debtor to acquire specific goods.

17        There is little doubt that when Desert Volkswagen reserved for itself a security interest in

18   the Passat upon its sale, that security interest was a purchase-money security interest.   The

19   obligation was "incurred as all or part of the price of the collateral," making it a purchase-money

20   obligation, and that obligation was "incurred with respect to that collateral."   *Id.*

21        The question is whether the transfer of the debtors' obligation from Desert Volkswagen

22   to VW Credit affected the purchase-money status of the security interest debtors granted in the

23   Passat.[30]  This question has not arisen under Nevada law, or since 2001, when revisions to Article

24   _____

25        [30]The transfer of the debt assigned, as a matter of law, Desert Volkswagen's security interest in the Passat,
     and no further notations on certificate of title were necessary to perfect the security interest thus transferred against
26   debtors' creditors.  UCC § 9-310(c).  *See also* Cmt. 4 to UCC § 9-310(c).

9 went into effect nationwide, in any other state.  But prerevision law and commentary universally held that transfer of the claim did not destroy purchase-money status.  General Elec. Credit Corp. v. Allegretti, 161 Ill. App. 3d 853, 859-60, 515 N.E.2d 721, 725-26 (1987) (finding that transfer of debt and security interest did not destroy purchase-money status for purposes of 11 U.S.C. § 522(f)); Brooks v. Franklin Fin. Corp. (*In re* Brooks), 74 B.R. 418 (Bankr. N.D. Ga. 1987) (same); Creditthrift of Am. v. Littlejohn (*In re* Littlejohn), 20 B.R. 695, 697 (Bankr. W.D. Ky. 1982); *In re* Smallwood, 20 B.R. 699 (Bankr. W.D. Ky. 1982); 8A LARY LAWRENCE, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE § 9-107:16 (2006).[31]

Hawkland's treatise succinctly confirms that the drafters of Article 9 intended this result:

> Presumably to make it clear that PMSIs could be assigned, the Code drafters defined purchase money security interests in terms of the manner in which the interest was created rather than in terms of the person or entity in favor of whom the interest was created. It is therefore possible, and indeed regularly occurs, that the person or entity asserting a PMSI did not itself extend the value necessary to create the interest initially. For example, if seller sells goods and retains a security interest in them, that interest is a PMSI. If the seller perfects the security interest and later assigns that security interest to a third party, the third party becomes the holder of a PMSI. This result means, among other things, that the inquiry is not into the status of the person asserting the PMSI, but into the purchase money nature of the original transaction initially.

9A WILLIAM D. HAWKLAND, HAWKLAND UCC SERIES § 9-103:1 [Rev.] (Frederick H. Miller, ed., 2006).

Debtors have thus failed to establish that VW Credit does not have the required purchase-money security interest.  As a result, the hanging paragraph precludes the debtors from bifurcating VW Credit's secured claim.  Debtors must now treat the entire allowed amount of the secured creditor's claim in the plan as one claim.  That is what the hanging paragraph requires.

---

[31]This case does not involve any refinancing of the initial security interest in the Passat, or the cross-collateralization of the Passat with other collateral, or the securing of non-purchase-money obligations with the purchase-money security interest in the Passat, all fact patterns that courts have found do not create, at least for consumers, purchase-money security interests. *See* Cmts. 7 & 8 to UCC § 9-103. *See also* UCC § 9-103(h).

## V.    THE APPLICABLE RATE OF INTEREST

But, at least for this case, that is all that the hanging paragraph requires.  Section 306 of BAPCPA did not purport to change the provisions of Section 1325(a)(5)(B), which allow a Chapter 13 debtor to confirm a plan over the dissent of a secured creditor if the plan pays the secured creditor a stream of payments that has a value, as of the effective date of the plan, equal to the allowed amount of the secured creditor's claim.  Put colloquially, BAPCPA prevented stripdown, not cramdown.

Thus, in this case, if the present value of the payments to be made to VW Credit equals $18,802.38, debtors may confirm their plan.  The issue becomes what interest rate will yield a present value equal to the allowed amount of VW Credit's secured claim.  VW Credit claims that Section 306(b) of BAPCPA requires that its contract rate of 13.35% be used.  Its argument is based on two Latin maxims – *lex specialis derogat legi generali* (a specific law supersedes a general one) and *lex posterior derogat legi priori* (a later law supersedes an earlier one).  In short, it argues that since BAPCPA's change in the allowed amount was so beneficial to creditors, Section 306 should be read as the sovereign's intent that all other specifics controlling the treatment of a claim subject to the hanging paragraph should also be changed to benefit the secured creditor.

That argument does not withstand analysis.  Nothing in the specific language of the hanging paragraph changes the "effective date" language that historically has allowed debtors to return to secured creditors the allowed amount of their claims at a market rate of interest.[32]  Moreover, ever since Till v. SCS Credit Corporation, 541 U.S. 465 (2004), the calculation of the  interest rate has been routinized; in this district, parties typically begin with prevailing prime rate, and then adjust

---

[32]This is confirmed in the legislative history.  As Professor William Whitford notes, "No version of the legislation ever included a provision concerning the interest rates paid to secureds in chapter 13, even though this was an issue often raised at the Commission and advocated by the four commissioners who dissented from the majority Commission report."  Whitford, *supra* note 3, at 42; *see also* Kilpatrick, *supra* note 3, at 834 ("Since the provisions relating to modification and interest rates were not altered by BAPCPA, repayment terms and interest rates may be of greater significance in future cases.").

it for relative risk.[33] Although this method contains many methodological errors,[34] it is the method that the Supreme Court has indicated that lower courts should adopt, and nothing specific in BAPCPA, or legitimately implied by other provisions of BAPCPA, changes this result.

It is significant that every other court to consider this issue has also ruled against an implied repeal of *Till*.  *See, e.g., In re* Brooks, 344 B.R. 417, 422 (Bankr. E.D.N.C. 2006) ("As the hanging paragraph does not prevent the application of § 1322(b)(2) to 910 claims, the court finds that the interest on such claims does not have to be calculated at the contract rate."); *In re* DeSardi, 340 B.R. 790, 814-15 (Bankr. S.D. Tex. 2006) ("Congress had plentiful opportunity to overturn or constrain *Till* in its recent BAPCPA amendments. . . .  No remedial legislation has been enacted, and consequently, this Court will continue to apply the *Till* rate in appropriate cases."); *In re* Fleming, 339 B.R. 716, 723-24 (Bankr. E.D. Mo. 2006) ("A creditor whose claim comes within the 910 Day Car Language contained in Section 1325(a)(9) of the Bankruptcy Code is entitled to receive post-petition interest at a current rate determined by an adjustment from the prime rate based on the risk of nonpayment under *Till*"); *In re* Johnson, 337 B.R. 269, 273 (Bankr. M.D.N.C. 2006) ("Section 1325(a)(9) prevents a debtor from paying less than the full contract amount if the debtor chooses to retain the vehicle. However, pursuant to Section  1322(b)(2), a debtor may still modify the term and interest rate of the loan"); *In re* Robinson, 338 B.R. 70, 75 (Bankr. W.D. Mo. 2006) ("I conclude that the BAPCPA amendment did not overrule *Till*"); *In re* Shaw, 341 B.R. 543, 547 (Bankr. M.D.N.C. 2006) ("[G]iven Congress's knowledge of the *Till* decision and Congress's decision not to change to the applicable statutory language when enacting BAPCPA, this court

---

[33]At oral argument, counsel for VW Credit asserted that the practice in this district is to assume a rate equal to the prevailing prime rate plus two percentage points as a "no look" rate; that is, a presumptively correct rate that all parties accept unless challenged.

[34]*See* Matthew Henschen O'Brien, Note, *Tilling the Cram Down Landscape: Using Securitization Data to Expose the Fundamental Fallacies of* Till, 59 VAND. L. REV. 257, 272-81 (2006).  In addition, most cases applying *Till* adjust upward the interest rate from the prime rate to account for risk.  The prime rate, however, is generally viewed as a rate for unsecured loans, and thus in appropriate cases one might apply a below-prime rate to reflect that a creditor's risk of loss is lower if the loan is secured, given the creditor's alternate source of repayment.

1    concludes that the *Till* rate remains the proper interest rate with which secured claims must be paid

2    to meet the requirements of § 1325(a)(5)(B)(ii).""); *In re* Soards, 344 B.R. 829, 831 (Bankr. W.D. Ky.

3    2006) ("The language of 11 U.S.C. § 1325(b)(5)(B)(ii) was unchanged by BAPCPA and the

4    Supreme Court's interpretation of this language in *Till* is still valid."); *In re* Wright, 338 B.R. 917,

5    920 (Bankr. M.D. Ala. 2006) ("The BAPCPA amendments to § 1325 simply do not address the

6    issue of the appropriate interest rate applicable to secured claims under § 1325(a)(5)(B)(ii). Thus

7    *Till* has not been abrogated by the BAPCPA amendments").

8         Here, the parties stipulated that the prime rate in effect at the time of the confirmation

9    hearing was 7.5%. Debtors argue that the risk premium for them should only be one-half

10   percentage point, leading to the 8.0% rate that they propose in the plan. Debtors assert that the

11   risk that they will default is low, given the Trejos' stable marriage, Mr. Trejos' stable job, the fact

12   that the Passat is and always has been insured, and finally the fact that Ms. Trejos' has an interest

13   in gas reserves that produces as much as $25,000 a year in royalties. VW Credit argues that the

14   standard premium of two percentage points should be added, for an effective rate of 9.5%, since

15   VW Credit alleges that as many as 40% to 50% of all chapter 13 debtors fail to complete their

16   plans.

17        Under *Till*, the evidentiary burden falls squarely on VW Credit to establish the need for an

18   interest rate higher than the one proposed by the Chapter 13 debtor. *In re* Taranto, 344 B.R. 857,

19   863 (Bankr. N. D. Ohio 2006); *In re* Bivens, 317 B.R. 755, 764 (Bankr. N.D. Ill. 2005) *citing Till*, 541

20   U.S. at 479 ("The court must therefore hold a hearing at which the debtor and any creditors may

21   present evidence about the appropriate risk adjustment . . . the evidentiary burden [is] squarely on

22   the creditors, who are likely to have readier access to information."). VW Credit presented the

23   court with argument but no evidence to establish the need for an interest rate higher than the one

24   proposed by the debtors. Given the debtors' credible and unrebutted evidence that their plan

25   presents a low risk of default, the court will adopt their interest rate of 8.0%.

26

1  **VI.  CONCLUSION**

2       As so modified, the court confirms the debtors' plan.  The debtors may pay VW Credit's

3  allowed secured claim of $18,802.38 over the life of the plan at a simple interest rate of 8.0%.  This

4  opinion constitutes the court's findings of fact and conclusions of law under FED. R. BANKR. P.

5  7052.  The debtors are directed to prepare and submit a separate order confirming their plan in

6  accordance with this district's procedures for such confirmation orders.

7  Copies sent to:

8  JEREMY T BERGSTROM mbergstrom@mileslegal.com

9
10  CHRISTOPHER PATRICK BURKE atty@cburke.lvcoxmail.com

11  MICHAEL W. CHEN yvette@ccfirm.com

12  RICK A. YARNALL ecfmail@LasVegas13.com

13

14  # # #

15

16

17

18

19

20

21

22

23

24

25

26